# In the United States District Court
# for the Southern District of Georgia
# Waycross Division

LAWRENCE REVIS, JR.,

    Plaintiff,

           v.

T&A FARMS, TIMOTHY DALE DAVIS,
ALPHINE DAVIS, and STACEY
DINWIDDIE,

    Defendants.

No. 5:14-CV-88

## ORDER[1]

Before the Court in this race discrimination case is Defendants T&A Farms, Timothy Dale Davis ("Dale"), Alphine ("Alphine") Davis, and Stacey Dinwiddie's ("Dinwiddie") Motion for Summary Judgment, dkt. no. 67. The motion is fully briefed and ripe for disposition. Dkt. Nos. 73-74, 80. For the reasons below, it will be **DENIED**. Plaintiff Lawrence Revis, Jr. ("Revis") claims that Defendants ran a racist workplace and laid him off. His evidence raises genuine

---

[1] This is an amended version of dkt. no. 82. The sole changes are the inclusion of this footnote and footnote 6 at page 11 below, which was unintentionally left out of the original Order. The deadlines for briefing Revis' retaliation claim given in the first order are unaffected by today's version and have been deleted here for simplicity's sake.

issues of material fact, and therefore, the jury must decide this matter.

### Factual Background[2]

**Revis Worked for and with Defendants**

The Court views the evidence most favorably to the nonmovant, Revis, as it must in deciding summary judgment. Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 507 (11th Cir. 2000). It leaves for the jury the sifting through of ordinary inconsistencies in his case. Tomlin v. JCS Enters., Inc., 13 F. Supp. 3d 1330, 1332 n.1 (N.D. Ga. 2014).

Revis worked for T&A Farms from sometime in 2010 or 2011 to November 2013, then again for two days in summer 2014. Dkt. No. 74 ¶¶ 40, 51. T&A Farms is a family egg farm. Id.

---

[2] Two declarations that Revis submitted do not comply with 28 U.S.C. § 1746. Declaration of Tim O'Hara, dkt. no. 73-12, lacks a date and perjury statement. Revis' own declaration, dkt. no. 73-3, lacks the specific day that it was signed. These flaws could justify disregarding the declarations. See, e.g., Orr v. Orbis Corp. (Wisc.), No. 1:07-CV-2653, 2010 WL 3368124, at *3 (N.D. Ga. July 30, 2010), adopted, 2010 WL 3368119 (N.D. Ga. Aug. 23, 2010). However, the Court declines to do so for four reasons. Defendants did not object. See Hepp v. Paul Revere Life Ins. Co., No. 8:13-CV-2836, 2015 WL 4072101, at *2 (M.D. Fla. July 2, 2015) ("Given that . . . there is no dispute regarding the authenticity of the declarations, and no showing of prejudice to Defendants, the Court finds no reason to strike . . . ."). The declarations' content "could be 'reduced to admissible evidence at trial,'" by having the declarants testify. Macuba v. Deboer, 193 F.3d 1316, 1323 (11th Cir. 1999); see also Calhoun v. McHugh, 2 F. Supp. 3d 1217, 1226 (N.D. Ala. 2014). Extrinsic evidence could confirm the declarations' dates: O'Hara's refers to "last Thursday" and "again on Saturday," dkt. no. 73-12 ¶ 5, while Revis's specifies that it was signed in October 2016. Dkt. No. 73-3 at 6. See Proch v. DeRoche, No. 3:08-CV-484, 2011 WL 6841319, at *3 n.8 (N.D. Fla. Dec. 20, 2011) ("[E]xtrinsic evidence could demonstrate the period when the declaration was signed . . . ."). Besides, the declarations are not determinative of the present motion's outcome anyway.

¶¶ 1-2, 13. Hens there lay eggs in nests, and the eggs roll onto a conveyer belt, whence they are collected. Id. ¶ 2. Two sorts of employees help with this process: walkers and belt runners. Walkers train chickens to lay their eggs inside the nests. Id. Revis was one of these. Id. ¶ 40. Belt runners take eggs from the belts. Id. ¶ 2. Each of T&A Farms' three chicken houses needed one belt runner, plus either its own walker or a shared one, during peak season. Id. ¶¶ 3-4. The farm also hired relief workers. Id. ¶ 5. Employees were at-will, without written contracts. Id. ¶ 14.

Peak egg season would come four weeks after chickens arrived and last for another four. Id. ¶ 8. Outside of peak season, Defendants would halve their workforce. Id.

Dale owns T&A Farms; the parties disagree as to whether Alphine is a co-owner. Id. ¶ 15. Alphine is his wife, and Dinwiddie their daughter. Id. ¶¶ 16-17, 21-22.

Alphine worked at the farm two to three times weekly. Id. ¶ 24. She would assign some tasks. Dkt. No. 73-6 at 87:8-16. Employees would report issues to her in Dale's absence. Id. at 87:19-23. Dale and Alphine claim that Alphine had "no managerial or supervisory responsibility." Dkt. No. 74 ¶ 21.

Dinwiddie "regularly worked" at the farm. Id. ¶ 27. Alphine allegedly once told Revis, "[Dinwiddie] is going to be

AO 72A
(Rev. 8/82)

the manager. I'm going to be out for a couple of days. . . . You all need to do what she says." Dkt. No. 73-2 at 49:16-19; see also Dkt. No. 73-5 at 43:12-15 (deposition of Sheila Smallwood ("Sheila")[3] (quoting Alphine as saying, "[Dinwiddie] is over this farm now. . . . [W]hatever [Dinwiddie] say [sic], you do it.")). Dinwiddie gave workers days off and assigned tasks, and Revis considered her his direct manager in Dale's absence. Dkt. No. 73-2 at 49:22-50:8; Dkt. No. 73-5 at 54:25-55:18; Dkt. No. 73-6 at 85:8-86:6, 105:5-7.

**Revis Alleges that Defendants Maintained Racist Work Conditions**

Revis alleges that T&A Farms was a hotbed of racism, with racist working conditions and Defendants constantly using invidious racial epithets. Black employees allegedly had to clean white employees' eggs for them. Dkt. No. 73-6 at 49:2-3. Revis claims that eating lunch in Defendants' office was a right reserved to whites. Dkt. No. 73-2 at 48:2-13. So was taking free water from, or using, a refrigerator. Id. at 47:17-19; see also Dkt. No. 73-5 at 88:6-90:7. Black employees could allegedly only sit on milk crates, while white ones could use chairs. Dkt. No. 73-5 at 58:4-6. Revis claims that Defendants cut black employees' hours, pointing to financial concerns, but brought on paid white relief workers

---

[3] Revis' sister-in-law; she worked at the farm. Dkt. No. 74 ¶ 39.

to take the shifts. Dkt. No. 73-2 at 38:5-40:15; Dkt. No. 73-5 at 86:8-25; Dkt. No. 73-6 at 82:4-83:16.[4]

Defendants supposedly paid white employees more than black ones. Sheila claims to have once found a payroll paper indicating that white employees earned $55 to $60 a day. Dkt. No. 73-5 at 44:7-12. Revis also testified that he saw the paper; he said that it listed the wages of all white employees, including two who were unrelated to Dale, as $55 daily. Dkt. No. 73-2 at 25:18-27:11. He confronted Dale, who allegedly told him, "If you don't like the way I run this, you can leave." Id. at 32:4-7. Defendants say that all employees other than Michael were paid $40 daily, and that Michael only made $42.85 a day. Dkt. No. 74 ¶¶ 10, 32.

---

[4] Revis' declaration states that Defendants barred black employees from using farm bathrooms, and he had to use the woods instead. Dkt. No. 73-3 ¶ 9. However, in his deposition, he testified that the chicken-house bathroom had an out-of-order sign on it when its toilet "looked like someone throw'd mud in it" and no one would want to use it "because that's just plain nasty." Dkt. No. 73-2 at 42:20-43:14. He further testified that he and Sheila could use the bathroom while the sign was up, as long as they brought their own toilet paper, just like white employees. Id. at 43:25-44:3, 45:12-23, 46:4-6; cf. id. at 44:13-15 (describing Revis' biggest issues with the bathroom being needing to bring one's own toilet paper and "the fact that it had an out-of-order sign on it, when it was working. That's the main thing with me."). There was nothing hinting of a color bar, only unsanitary conditions and Revis' belief that they did not justify an out-of-order sign. His declaration offers no explanation for his belated unequivocal accusation of racial segregation. The Court thus finds this portion of the declaration to be a sham, and accordingly, disregards it. See Cribbs v. NFI Indus., Inc., No. CV411-263, 2013 WL 5407203, at *6 (S.D. Ga. Sept. 25, 2013) ("This Court may . . . disregard Plaintiff's declaration if it contradicts prior deposition testimony without providing a valid explanation."); cf. Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc., 736 F.2d 656, 657 (11th Cir. 1984) ("When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.").

AO 72A
(Rev. 8/82)

**Revis Alleges that Defendants Used Racial Epithets**

Defendants allegedly infused racism into their language. Dale purportedly used many slurs:

> The "N" word came out maybe once every few weeks. "Yard monkey" was him referring to [Sheila's] grandbaby by one of the other black employees. . . . "I'll slap the black off [of you]" [ ] was if we weren't doing our work properly. . . . The "coon" word was used at least once, if not twice a week. . . .

Dkt. No. 73-5 at 40:13-41:7; see also id. at 41:10-16; Dkt. No. 73-6 at 83:13-84:10; Dkt. No. 73-12 ¶ 4 ("[Dale] admitted to me that he called us the 'N' word, yardmonkeys and coons."); Dkt. No. 73-13 ¶ 12 (describing Dale making black-power salute and saying, "Ain't that what y'all niggers do back in the day!"); Dkt. No. 73-3 ¶ 7 (describing Dale calling black workers "coons" and "yard monkeys"); Dkt. No. 73-2 at 32:17 ("He called me 'boy'.").

Sheila recalls protesting Dale's use of "nigger." "[She] went to him three or four times . . . ." Dkt. No. 73-5 at 42:4-6. She testified that Dale responded that when he was young, his father "slapped [him] in his mouth" for using a black man's name, telling him, "Those are niggers. That's what you call them." Id. at 42:10-17. Dale supposedly told her, "Just take what we say and move on." Id. at 42:20-21; cf. Dkt. No. 73-2 at 34:12-14 (deposition of Lawrence Revis,

AO 72A
(Rev. 8/82)

Jr.) (saying when confronted about calling black men "boys," Dale "laughed it off").

After President Obama's reelection, Sheila says that Dale asked her and John Smallwood ("John"), "Why did you all get that coon back into office?" Id. at 85:20-22.

Dale denies ever using any of these racial slurs against black employees. Dkt. No. 74 ¶ 59; see also Dkt. No. 67-3 ¶ 42 (claiming that he uses "boy," without racial overtones, to refer to males, including friends and family members).[5]

Dale was purportedly not the only Defendant to speak in a racist way. Alphine supposedly said that Sheila's grandson's father "look[ed] like a yard monkey," and asked if she was "afraid that [her] grandson would come out looking like a yard monkey and be as black as [the father]." Dkt. No. 73-5 at 72:8-13. When Sheila protested, Alphine allegedly replied, "This is my property, and I can say and do what I want to." Id. at 74:8-9. Alphine denies using any of the racial slurs alleged against employees. Dkt. No. 67-4 ¶ 19.

Dinwiddie allegedly referred to black employees, but not white men, as "boys." Dkt. No. 73-5 at 78:17-79:8, 103:6-11; Dkt. No. 73-2 at 51:23-52:3. One day, Sheila's mixed-race adopted son came to visit the farm. Dkt. No. 73-5 at 80:9-13. Dinwiddie supposedly asked, "How can you all have a mixed

---

[5] Practically identical paragraphs appear in Alphine's and Dinwiddie's declarations. Dkt. No. 67-4 ¶¶ 19, 24; Dkt. No. 67-5 ¶¶ 15, 21.

baby?" Id. at 80:13-16. Dinwiddie allegedly said that she was trying to become a foster parent, but had rejected a black child. Id. at 80:18-20. "I couldn't tell them I was racist, or I was a bitch," she reportedly said, but "[a] coon or a nigger baby would never be welcome around our table." Id. at 81:10-11, 20-21; cf. Dkt. No. 73-2 at 51:5-18 (testifying Dinwiddie called black people "coon," "the 'N' word," and "boy"). When Sheila replied that her son would be taught to see love and not skin color, Dinwiddie allegedly answered, "[I]t's not like that in our house." Id. at 81:20-25.

Then, several other black employees walked in. Sheila says that Dinwiddie looked around and said, "You all make me feel threatened, like you all want to jump on me." Id. at 82:7-15. "Ain't that what you all black people do, you all gang up and jump on people?" she allegedly asked. Id. at 82:20-22. According to Sheila, Dinwiddie also once compared a group of black people to a cow herd. Id. at 83:19-22. Dale had supposedly said something similar to Sheila's son. Id. at 83:22-23; cf. Dkt. No. 73-6 at 98:15-17 (saying Dale admitted to comparing black people to "a bunch of cows trying to jump on you.").

Finally, Dinwiddie allegedly told black employees listening to rap that Dale "don't like you playing that nigger music out here." Id. at 84:16-18; cf. Dkt. No. 73-13 ¶ 9.

AO 72A
(Rev. 8/82)

Dinwiddie denies using the racial slurs alleged against black employees. Dkt. No. 67-5 ¶ 15.

**Revis Is Laid Off and Files an EEOC Charge**

Revis worked for Defendants for three different time periods. Dkt. No. 73-2 at 15:6-7. The first time, in 2010, he only stayed "for a week or two." Id. at 15:8-9, 16-21. Three or four months later, he was called back for another six months. Id. at 15:11-12. He was laid off around October or November, and Dale said that he would rehire Revis later. Id. at 15:13-14. Around April 2013, "[Dale] hired [him] back for three or four months." Id. at 15:14-15, 36:16-19. At that time, Dale, pointing to Sheila's and John's EEOC charges, had Revis sign a paper indicating that he "[was] getting hired part time." Id. at 16:15-20. This meant that Revis would only work five days every week, rather than six or seven. Id. at 18:3-11. Revis was laid off again in November 2013. Dkt. No. 74 ¶ 41. He contends that "he was immediately replaced by . . . a Caucasian male." Id.

Revis filed an EEOC race discrimination charge on January 3, 2014. Id. ¶ 51; Dkt. No. 73-2 at 19-21. He claims that Dale contacted him again in summer 2014, asked him to drop the charge and to give him information about John's and Sheila's discrimination case, and terminated him two days later when he refused. Dkt. No. 73-3 ¶ 10. Revis had thought that he would

be hired "full time and have a long-term employment." Dkt. No. 73-2 at 59:3-4.

Revis filed this lawsuit on October 28, 2014. Dkt. No. 1. He ultimately alleged race discrimination and disparate treatment. Dkt. No. 7. Dale says that Revis decided to make "highly inflammatory, false" allegations against him and his family after Sheila visited the EEOC's website. Dkt. No. 67-3 ¶ 39. He believes that Sheila, "with her strong personality, persuaded [Revis] and fellow African American co-workers[ ] to join with her in a conspiracy to sue [him] and [his] family for money in a bogus discrimination case." Id. ¶ 40.

## LEGAL STANDARD

Summary judgment is required where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit." FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

The court must view the evidence most favorably to the nonmoving party and draw all reasonable inferences in that

AO 72A
(Rev. 8/82)

party's favor. Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 507 (11th Cir. 2000).

The movant must establish that there is no genuine issue of material fact by showing that the nonmovant's case lacks supporting evidence. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 325 (1986). If it does, then the nonmovant can show "that the record in fact contains [such] evidence, sufficient to withstand a directed verdict motion, which was 'overlooked or ignored' by the [movant], who has thus failed to meet [its] initial burden." Anderson, 477 U.S. at 257; Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1116 (11th Cir. 1993) (quoting Celotex, 477 U.S. at 332 (Brennan, J., dissenting)). Or, the nonmovant can present "additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1117.

**DISCUSSION**

Revis' claims survive summary judgment.[6] Revis alleges discrimination and disparate treatment[7] in violation of 42 U.S.C. § 2000e et seq. ("Title VII") and 42 U.S.C. § 1981

---

[6] Mostly. Revis surrenders his Title VII claims against Alphine and Dinwiddie, because non-employers are not liable under Title VII. Dkt. No. 71 at 7 n.3, 29 n.15; see also Dearth v. Collins, 441 F.3d 931, 933 (11th Cir. 2006). Defendants' motion is **GRANTED** as to these claims.

[7] The parties do not distinguish between these two claims, and so the Court will not, either. See generally Dkt. Nos. 67-2, 73, 80; Resolution Tr. Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995) (en banc) ("There is no burden upon the district court to distill every potential argument . . . on summary judgment. Rather, the onus is upon the parties to formulate arguments . . . ." (internal citation omitted)).

AO 72A
(Rev. 8/82)

("Section 1981").[8] Dkt. No. 7 ¶¶ 21-32. Both statutes use "the same standards of proof and . . . analytical framework." Bryant v. Jones, 575 F.3d 1281, 1296 n.20 (11th Cir. 2009). Title VII only applies to employers with at least fifteen employees. 42 U.S.C. § 2000e(b). Here, there is a genuine issue of fact as to this requirement, and as to the merits of Revis' case. The Court must therefore deny summary judgment.

### A. An Issue of Fact Remains as to the Number of T&A Farms Employees.

Defendants first argue that T&A Farms does not have fifteen employees, and so is exempt from Title VII. Dkt. No. 67-2 at 3-4. A fact issue remains. Title VII only applies to those employers who have "fifteen or more employees for each

---

[8] Defendants contend that Revis lacks standing for his Section 1981 claim, as he was an at-will employee without a contract. Dkt. No. 67-2 at 22-25. The Court follows every circuit court—and every Eleventh Circuit district court—to decide the question in holding that an at-will employee can assert a Section 1981 racial discrimination claim, at least where state law deems at-will employment contractual(as in Georgia). See, e.g., Aquino v. Honda of Am., Inc., 158 F. App'x 667, 673 n.3 (6th Cir. 2005); Walker v. Abbott Labs., 340 F.3d 471, 472 (7th Cir. 2003); Turner v. Ark. Ins. Dep't, 297 F.3d 751, 756, 759 (8th Cir. 2002) (holding law clearly established); Lauture v. Int'l Bus. Machs. Corp., 216 F.3d 258, 263 (2d Cir. 2000); Perry v. Woodward, 199 F.3d 1126, 1133 (10th Cir. 1999); Fadeyi v. Planned Parenthood Ass'n of Lubbock, Inc., 160 F.3d 1048, 1050-52 (5th Cir. 1998); Forehand v. Fulton County, 510 F. Supp. 2d 1238, 1252 (N.D. Ga. 2007); Ultimax Transp., Inc. v. British Airways, Inc., 231 F. Supp. 2d 1329, 1339 (N.D. Ga. 2002) (Carnes, J.); Farrior v. H.J. Russell & Co., 45 F. Supp. 2d 1358, 1366 (N.D. Ga. 1999). Recognizing such relationships as covered by Section 1981 is especially important given that that law exists to protect minority employees—many of whom are employed at-will. Farrior, 45 F. Supp. 2d at 1365-66.
As for the supposed lack of a contract, "on-going exchange of labor and pay" between Revis and Defendants "represents [an unwritten] contract" for purposes of Section 1981. Farrior, 45 F. Supp. 2d at 1365 (citing Georgia law); see also Spriggs v. Diamond Auto Glass, 165 F.3d 1015, 1018 (4th Cir. 1999); Lane v. Ogden Ent., Inc., 13 F. Supp. 2d 1261, 1272 (M.D. Ala. 1998) ("'Contract' is used in § 1981 in its basic legal meaning . . . ."). Defendants' argument is thus meritless.

working day in each of twenty or more calendar weeks in the current or preceding calendar year." 42 U.S.C. § 2000e(b). Employees are all those in ongoing employment relationships—not just those working on any given day. Walters v. Metro. Educ. Enters., Inc., 519 U.S. 202, 206-08 (1997).

Defendants argue that they do not have fifteen employees. Dale testifies that he does not have more than six full-time employees "at any given time." Dkt. No. 67-3 ¶ 3; see also id. ¶ 8. He also claims that he usually does not hire relief workers for "more than a few days at a time." Id. ¶ 4.

However, Revis has evidence that there may have been at least fifteen employees. Sheila testified that there were fifteen or sixteen. Dkt. No. 73-5 at 35:10-20; see also Dkt. No. 73-4 ¶ 4 (naming 30 T&A Farms employees in 2013). John counted ten to fifteen, some of them relief workers. Dkt. No. 73-6 at 33:20-34:11. Revis testified that there would be up to fifteen, eight to thirteen of whom would be present on any given day. Dkt. No. 73-2 at 22:4-23:25. Some documentation supports these estimates: Timothy and Alphine cut checks to 25 different people between late December 2012 and the start of 2014. Dkt. No. 73-16 at 7-55. Revis' evidence defeats summary judgment based on the number of T&A Farms employees.

## B. Issues Remain as to the Merits of Revis' Case.

Genuine factual issues also remain as to the merits of Revis' case. An employer can be liable if one of its employment decisions is based on discriminatory intent. Holland v. Gee, 677 F.3d 1047, 1055 (11th Cir. 2012). Plaintiffs can establish such intent via direct, circumstantial, or statistical evidence. Carter v. City of Miami, 870 F.2d 578, 581 (11th Cir. 1989). Revis' case survives based on circumstantial evidence. He must win the three-set tennis match prescribed by McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973): (1) He must make out a prima facie case of discrimination; (2) then, Defendants can "articulate some legitimate, nondiscriminatory reason" for their actions; (3) lastly, he must then show that Defendants' reason is mere pretext. He makes it through this gauntlet.

### a. Revis establishes his prima facie case.

Revis establishes a prima facie discrimination case. He must prove that he: 1) belonged to a racial minority; 2) was subjected to an adverse job action; 3) was treated less favorably than non-minority employees; and 4) was qualified for his job. Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999); Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997). Elements one and four are uncontested. Dkt. No. 67-2 at 8. Genuine factual issues remain as to whether Revis

14

"suffered an adverse employment action" and "employment . . . policies were differently applied to [him]." Ch. 7 Tr. v. Gate Gourmet, Inc., 683 F.3d 1249, 1255 (11th Cir. 2012).

Revis testified that he was laid off and terminated. Dkt. No. 74 ¶ 51. This creates genuine factual issues as to whether he suffered adverse employment action. See Cotton v. Cracker Barrel Old Country Store, 434 F.3d 1227, 1231 (11th Cir. 2006) ("A reduction in an employee's hours, which reduces the employee's take-home pay, qualifies as a[n] . . . employment action."); Mealing v. Ga. Dep't of Juvenile Justice, No. CV 110-123, 2013 WL 12095273, at *6 (S.D. Ga. Mar. 25, 2013) (noting termination is adverse action).

Revis' evidence also creates genuine issues of material fact as to whether employment policies were applied differently to him than to white employees.[9] All that he needs is "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination." Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011) (citation omitted). He has one. According to his evidence, Defendants infused their language with racial epithets; barred black employees from whites-only chairs, office space, and a refrigerator; and fired Sheila after

---

[9] It does not matter that he has not identified a white comparator, because "a plaintiff may use non-comparison circumstantial evidence to raise a reasonable inference of intentional discrimination and thereby create a triable issue." Gate Gourmet, Inc., 683 F.3d at 1256 (citation omitted).

calling her an "uppity nigger." See discussion supra. Revis' evidence meets his fourth and final prima facie element.

### b. Defendants may offer a non-racist reason.

Defendants must now justify their actions in a non-discriminatory way. Their burden is "exceedingly light," with "no credibility assessment." Furcron v. Mail Ctrs. Plus, LLC, No. 15-14595, 2016 WL 7321211, at *12 (11th Cir. Dec. 16, 2016) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993); Smith v. Horner, 839 F.2d 1530, 1537 (11th Cir. 1988)). Defendants say that they laid Revis off because production was seasonally down and he was an at-will employee. Dkt. No. 67-2 at 13-14. The Court will assume, without deciding, that this satisfies their burden.

### c. Revis creates a genuine factual issue as to pretext.

Revis still prevails, because he has evidence that Defendants' given reason is a mere pretext for discrimination. His evidence shows that Defendants used a tremendous amount of racial slurs, including Dale's constantly and insistently referring to him as "boy"; called a black employee an "uppity nigger" right before firing her; and racially segregated their chairs, office, and refrigerator. See discussion supra. This creates a genuine factual issue as to whether Defendants' stated reason for laying Revis off is pretext. See Ross v. Rhodes Furniture, Inc., 146 F.3d 1286, 1291-92 (11th Cir.

AO 72A
(Rev. 8/82)

1998) (holding jury could find pretext given differential employee discipline and decision-makers' two racially charged comments); Asmo v. Keane, Inc., 471 F.3d 588, 595 (6th Cir. 2006) (holding "discriminatory atmosphere at the defendant's workplace" can show pretext (citation omitted)); cf. Adams v. Austal, U.S.A., L.L.C., 754 F.3d 1240, 1254 (11th Cir. 2014) ("[The plaintiff] frequently experienced racial harassment by his supervisor's and coworkers' references to 'boy[ ]' . . . .").

The question for now is not whether these allegations are true. Nor is it whether, if they are, Defendants could place them in a nondiscriminatory context. It is only whether a rational juror could infer discriminatory intent behind employment actions adverse to Revis. One could only decide otherwise by finding facts and weighing credibility. This takes this case outside the scope of the Court's responsibility, so summary judgment must be **DENIED**.

### CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment, dkt. no. 67, is **DENIED**. It is, however, **GRANTED** as to Revis' Title VII claims against Alpine and Dinwiddie.

AO 72A
(Rev. 8/82)

**SO ORDERED**, this 16th day of March, 2017.

_____
LISA GODBEY WOOD, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA